FILED
CLERK, U.S. DISTRICT COURT

12/13/2021

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ VM _____ DEPUTY

TRACY L. WILKISON
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
MELISSA MILLS (Cal. Bar No. 248529)
J. JAMARI BUXTON (Cal. Bar No. pending)
SUSAN S. HAR (Cal. Bar No. 301924)
Assistant United States Attorneys
Public Corruption and Civil Rights Section
     1500 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone:  (213) 894-0627
     Facsimile:  (213) 894-7631
     E-mail:    Melissa.Mills@usdoj.gov
                Jamari.Buxton@usdoj.gov
                Susan.Har@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 2:21-CR-00572-FMO |
|---|---|
| Plaintiff, | PLEA AGREEMENT FOR DEFENDANT DAVID F. ALEXANDER |
| v. | |
| DAVID F. ALEXANDER, | |
| Defendant. | |

    1.   This constitutes the plea agreement between defendant DAVID

F. ALEXANDER ("defendant") and the United States Attorney's Office

for the Central District of California (the "USAO") in the above-

captioned case.  This agreement is limited to the USAO and cannot

bind any other federal, state, local, or foreign prosecuting,

enforcement, administrative, or regulatory authorities.

                    DEFENDANT'S OBLIGATIONS

    2.   Defendant agrees to:

a.   At the earliest opportunity requested by the USAO and provided by the Court, appear and plead guilty to the single-count information in the form attached to this agreement as Exhibit A or a substantially similar form, which charges defendant with making false statements in violation of 18 U.S.C. § 1001(a)(2).

b.   Not contest facts agreed to in this agreement.

c.   Abide by all agreements regarding sentencing contained in this agreement.

d.   Appear for all court appearances, surrender as ordered for service of sentence, obey all conditions of any bond, and obey any other ongoing court order in this matter.

e.   Not commit any crime; however, offenses that would be excluded for sentencing purposes under United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not within the scope of this agreement.

f.   Be truthful at all times with the United States Probation and Pretrial Services Office and the Court.

g.   Pay the applicable special assessment at or before the time of sentencing unless defendant has demonstrated a lack of ability to pay such assessments.

h.   Give up the right to indictment by a grand jury.

<u>THE USAO'S OBLIGATIONS</u>

3.   The USAO agrees to:

a.   Not contest facts agreed to in this agreement.

b.   Abide by all agreements regarding sentencing contained in this agreement.

c.   Except for criminal tax violations (including conspiracy to commit such violations chargeable under 18 U.S.C.

2

§ 371), not further criminally prosecute defendant for conduct described in the agreed-to factual basis set forth in Attachment A. Defendant understands that the USAO is free to criminally prosecute defendant for any other unlawful past conduct or any unlawful conduct that occurs after the date of this agreement.  Defendant agrees that at the time of sentencing the Court may consider the uncharged conduct in determining the applicable Sentencing Guidelines range, the propriety and extent of any departure from that range, and the sentence to be imposed after consideration of the Sentencing Guidelines and all other relevant factors under 18 U.S.C. § 3553(a).

     d.    At the time of sentencing, provided that defendant demonstrates an acceptance of responsibility for the offense up to and including the time of sentencing, recommend a two-level reduction in the applicable Sentencing Guidelines offense level, pursuant to U.S.S.G. § 3E1.1, and recommend and, if necessary, move for an additional one-level reduction if available under that section.

NATURE OF THE OFFENSE

4.    Defendant understands that for defendant to be guilty of the crime charged in the single-count information, that is, making false statements in violation of Title 18, United States Code, Section 1001(a)(2), the following must be true:

     a.    The defendant made a false statement;

     b.    The statement was made in a matter within the jurisdiction of the Federal Bureau of Investigation;

     c.    The defendant acted willfully; that is, the defendant acted deliberately and with knowledge both that the statement was untrue and that his conduct was unlawful; and

3

1        d.   The statement was material to the activities or

2  decisions of the Federal Bureau of Investigation; that is, it had a

3  natural tendency to influence, or was capable of influencing, the

4  agency's decisions or activities.

5                           PENALTIES

6      5.   Defendant understands that the statutory maximum sentence

7  that the Court can impose for a violation of Title 18, United States

8  Code, Section 1001(a)(2), is: five years' imprisonment; a three-year

9  period of supervised release; a fine of $250,000 or twice the gross

10  gain or gross loss resulting from the offense, whichever is greatest;

11  and a mandatory special assessment of $100.

12      6.   Defendant understands that supervised release is a period

13  of time following imprisonment during which defendant will be subject

14  to various restrictions and requirements.  Defendant understands that

15  if defendant violates one or more of the conditions of any supervised

16  release imposed, defendant may be returned to prison for all or part

17  of the term of supervised release authorized by statute for the

18  offense that resulted in the term of supervised release, which could

19  result in defendant serving a total term of imprisonment greater than

20  the statutory maximum stated above.

21      7.   Defendant understands that, by pleading guilty, defendant

22  may be giving up valuable government benefits and valuable civic

23  rights, such as the right to vote, the right to possess a firearm,

24  the right to hold office, and the right to serve on a jury. Defendant

25  understands that he is pleading guilty to a felony and that it is a

26  federal crime for a convicted felon to possess a firearm or

27  ammunition.  Defendant understands that the conviction in this case

28  may also subject defendant to various other collateral consequences,

1  including but not limited to revocation of probation, parole, or

2  supervised release in another case and suspension or revocation of a

3  professional license.  Defendant understands that unanticipated

4  collateral consequences will not serve as grounds to withdraw

5  defendant's guilty plea.

6      8.   Defendant understands that, if defendant is not a United

7  States citizen, the felony conviction in this case may subject

8  defendant to: removal, also known as deportation, which may, under

9  some circumstances, be mandatory; denial of citizenship; and denial

10  of admission to the United States in the future.  The Court cannot,

11  and defendant's attorney also may not be able to, advise defendant

12  fully regarding the immigration consequences of the felony conviction

13  in this case.  Defendant understands that unexpected immigration

14  consequences will not serve as grounds to withdraw defendant's guilty

15  plea.

FACTUAL BASIS

17      9.   Defendant admits that defendant is, in fact, guilty of the

18  offense to which defendant is agreeing to plead guilty.  Defendant

19  and the USAO agree to the statement of facts provided in Attachment A

20  hereto and agree that this statement of facts is sufficient to

21  support a plea of guilty to the charge described in this agreement

22  and to establish the Sentencing Guidelines factors set forth in

23  paragraph 11 below but is not meant to be a complete recitation of

24  all facts relevant to the underlying criminal conduct or all facts

25  known to either party that relate to that conduct.

SENTENCING FACTORS

27      10.  Defendant understands that in determining defendant's

28  sentence the Court is required to calculate the applicable Sentencing

Guidelines range and to consider that range, possible departures under the Sentencing Guidelines, and the other sentencing factors set forth in 18 U.S.C. § 3553(a). Defendant understands that the Sentencing Guidelines are advisory only, that defendant cannot have any expectation of receiving a sentence within the calculated Sentencing Guidelines range, and that after considering the Sentencing Guidelines and the other § 3553(a) factors, the Court will be free to exercise its discretion to impose any sentence it finds appropriate up to the maximum set by statute for the crime of conviction.

11. Defendant and the USAO agree to the following applicable Sentencing Guidelines factors:

| Base Offense Level: | 14 | [U.S.S.G. §§ 2C1.1(a)(1); |
| | | 2B1.1(c)(3)] |

Defendant and the USAO reserve the right to argue that additional specific offense characteristics, adjustments, and departures under the Sentencing Guidelines are appropriate. In particular, the USAO reserves the right to argue for applicability of enhancements pursuant to U.S.S.G. §§ 2C1.1(b)(3) and 3C1.1, and the parties reserve the right to argue for the appropriate enhancement pursuant to U.S.S.G. § 2B1.1(b)(1).

12. Defendant understands that there is no agreement as to defendant's criminal history or criminal history category.

13. Defendant and the USAO reserve the right to argue for a sentence outside the sentencing range established by the Sentencing Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1), (a)(2), (a)(3), (a)(6), and (a)(7).

6

1              WAIVER OF CONSTITUTIONAL RIGHTS

2      14.   Defendant understands that by pleading guilty, defendant

3 gives up the following rights:

4           a.   The right to persist in a plea of not guilty.

5           b.   The right to a speedy and public trial by jury.

6           c.   The right to be represented by counsel –– and if

7 necessary have the Court appoint counsel -- at trial.  Defendant

8 understands, however, that, defendant retains the right to be

9 represented by counsel –– and if necessary have the Court appoint

10 counsel -- at every other stage of the proceeding.

11          d.   The right to be presumed innocent and to have the

12 burden of proof placed on the government to prove defendant guilty

13 beyond a reasonable doubt.

14          e.   The right to confront and cross-examine witnesses

15 against defendant.

16          f.   The right to testify and to present evidence in

17 opposition to the charges, including the right to compel the

18 attendance of witnesses to testify.

19          g.   The right not to be compelled to testify, and, if

20 defendant chose not to testify or present evidence, to have that

21 choice not be used against defendant.

22          h.   Any and all rights to pursue any affirmative defenses,

23 Fourth Amendment or Fifth Amendment claims, and other pretrial

24 motions that have been filed or could be filed.

25             WAIVER OF RETURN OF DIGITAL DATA

26     15.   Understanding that the government has in its possession

27 digital devices and/or digital media seized from defendant, defendant

28 waives any right to the return of digital data contained on those

                              7

1  digital devices and/or digital media and agrees that if any of these
2  digital devices and/or digital media are returned to defendant, the
3  government may delete all digital data from those digital devices
4  and/or digital media before they are returned to defendant.

WAIVER OF APPEAL OF CONVICTION

6      16.  Defendant understands that, with the exception of an appeal
7  based on a claim that defendant's guilty plea was involuntary, by
8  pleading guilty defendant is waiving and giving up any right to
9  appeal defendant's conviction on the offense to which defendant is
10 pleading guilty.  Defendant understands that this waiver includes,
11 but is not limited to, arguments that the statute to which defendant
12 is pleading guilty is unconstitutional, and any and all claims that
13 the statement of facts provided herein is insufficient to support
14 defendant's plea of guilty.

LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE AND COLLATERAL ATTACK

16     17.  Defendant agrees that, provided the Court imposes a total
17 term of imprisonment on the count of conviction of no more than the
18 statutory maximum of five years, defendant gives up the right to
19 appeal all of the following: (a) the procedures and calculations used
20 to determine and impose any portion of the sentence; (b) the term of
21 imprisonment imposed by the Court; (c) the fine imposed by the Court,
22 provided it is within the statutory maximum; (d) to the extent
23 permitted by law, the constitutionality or legality of defendant's
24 sentence, provided it is within the statutory maximum; (e) the term
25 of probation or supervised release imposed by the Court, provided it
26 is within the statutory maximum; and (f) any of the following
27 conditions of probation or supervised release imposed by the Court:
28 the conditions set forth in Second Amended General Order 20-04 of

this Court; the drug testing conditions mandated by 18 U.S.C.
§§ 3563(a)(5) and 3583(d); and the alcohol and drug use conditions
authorized by 18 U.S.C. § 3563(b)(7).

18.   Defendant also gives up any right to bring a post-conviction collateral attack on the conviction or sentence, except a post-conviction collateral attack based on a claim of ineffective assistance of counsel, a claim of newly discovered evidence, or an explicitly retroactive change in the applicable Sentencing Guidelines, sentencing statutes, or statutes of conviction. Defendant understands that this waiver includes, but is not limited to, arguments that the statute to which defendant is pleading guilty is unconstitutional, and any and all claims that the statement of facts provided herein is insufficient to support defendant's plea of guilty.

19.   The USAO agrees that, provided all portions of the sentence are at the statutory maximum of five years specified above, the USAO gives up its right to appeal any portion of the sentence.

<u>RESULT OF WITHDRAWAL OF GUILTY PLEA</u>

20.   Defendant agrees that if, after entering a guilty plea pursuant to this agreement, defendant seeks to withdraw and succeeds in withdrawing defendant's guilty plea on any basis other than a claim and finding that entry into this plea agreement was involuntary, then (a) the USAO will be relieved of all of its obligations under this agreement; and (b) should the USAO choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then (i) any applicable statute of limitations will be tolled between the date of defendant's signing of this agreement and the filing commencing any such action; and

(ii) defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

<u>RESULT OF VACATUR, REVERSAL OR SET-ASIDE</u>

21.  Defendant agrees that if the count of conviction is vacated, reversed, or set aside, both the USAO and defendant will be released from all their obligations under this agreement.

<u>EFFECTIVE DATE OF AGREEMENT</u>

22.  This agreement is effective upon signature and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney.

<u>BREACH OF AGREEMENT</u>

23.  Defendant agrees that if defendant, at any time after the signature of this agreement and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney, knowingly violates or fails to perform any of defendant's obligations under this agreement ("a breach"), the USAO may declare this agreement breached.  All of defendant's obligations are material, a single breach of this agreement is sufficient for the USAO to declare a breach, and defendant shall not be deemed to have cured a breach without the express agreement of the USAO in writing. If the USAO declares this agreement breached, and the Court finds such a breach to have occurred, then: (a) if defendant has previously entered a guilty plea pursuant to this agreement, defendant will not be able to withdraw the guilty plea, and (b) the USAO will be relieved of all its obligations under this agreement.

1      24.   Following the Court's finding of a knowing breach of this

2 agreement by defendant, should the USAO choose to pursue any charge

3 that was either dismissed or not filed as a result of this agreement,

4 then:

5           a.   Defendant agrees that any applicable statute of

6 limitations is tolled between the date of defendant's signing of this

7 agreement and the filing commencing any such action.

8           b.   Defendant waives and gives up all defenses based on

9 the statute of limitations, any claim of pre-indictment delay, or any

10 speedy trial claim with respect to any such action, except to the

11 extent that such defenses existed as of the date of defendant's

12 signing this agreement.

13           c.   Defendant agrees that: (i) any statements made by

14 defendant, under oath, at the guilty plea hearing (if such a hearing

15 occurred prior to the breach); (ii) the agreed to factual basis

16 statement in this agreement; and (iii) any evidence derived from such

17 statements, shall be admissible against defendant in any such action

18 against defendant, and defendant waives and gives up any claim under

19 the United States Constitution, any statute, Rule 410 of the Federal

20 Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal

21 Procedure, or any other federal rule, that the statements or any

22 evidence derived from the statements should be suppressed or are

23 inadmissible.

24           COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES

25                       OFFICE NOT PARTIES

26      25.   Defendant understands that the Court and the United States

27 Probation and Pretrial Services Office are not parties to this

28 agreement and need not accept any of the USAO's sentencing

11

1   recommendations or the parties' agreements to facts or sentencing

2   factors.

3       26.  Defendant understands that both defendant and the USAO are

4   free to: (a) supplement the facts by supplying relevant information

5   to the United States Probation and Pretrial Services Office and the

6   Court, (b) correct any and all factual misstatements relating to the

7   Court's Sentencing Guidelines calculations and determination of

8   sentence, and (c) argue on appeal and collateral review that the

9   Court's Sentencing Guidelines calculations and the sentence it

10  chooses to impose are not error, although each party agrees to

11  maintain its view that the calculations in paragraph 11 are

12  consistent with the facts of this case.  While this paragraph permits

13  both the USAO and defendant to submit full and complete factual

14  information to the United States Probation and Pretrial Services

15  Office and the Court, even if that factual information may be viewed

16  as inconsistent with the facts agreed to in this agreement, this

17  paragraph does not affect defendant's and the USAO's obligations not

18  to contest the facts agreed to in this agreement.

19      27.  Defendant understands that even if the Court ignores any

20  sentencing recommendation, finds facts or reaches conclusions

21  different from those agreed to, and/or imposes any sentence up to the

22  maximum established by statute, defendant cannot, for that reason,

23  withdraw defendant's guilty plea, and defendant will remain bound to

24  fulfill all defendant's obligations under this agreement.  Defendant

25  understands that no one -- not the prosecutor, defendant's attorney,

26  or the Court -- can make a binding prediction or promise regarding

27  the sentence defendant will receive, except that it will be within

28  the statutory maximum.

NO ADDITIONAL AGREEMENTS

28.   Defendant understands that, except as set forth herein, there are no promises, understandings, or agreements between the USAO and defendant or defendant's attorney, and that no additional promise, understanding, or agreement may be entered into unless in a writing signed by all parties or on the record in court.

///

///

///

1          PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

2          29.  The parties agree that this agreement will be considered

3    part of the record of defendant's guilty plea hearing as if the

4    entire agreement had been read into the record of the proceeding.

5    AGREED AND ACCEPTED

6    UNITED STATES ATTORNEY'S OFFICE
     FOR THE CENTRAL DISTRICT OF
7    CALIFORNIA

8    TRACY L. WILKISON
     United States Attorney
9

10   _____          12/13/2021
     MELISSA MILLS                             _____
11   Assistant United States Attorney          Date

12   _____          11/29/2021
     DAVID F. ALEXANDER                         Date
13   Defendant

14   _____          11/29/21
     NINA MARINO                                Date
15   Attorney for Defendant DAVID F.
     ALEXANDER
16

17                      CERTIFICATION OF DEFENDANT

18       I have read this agreement in its entirety.  I have had enough

19   time to review and consider this agreement, and I have carefully and

20   thoroughly discussed every part of it with my attorney.  I understand

21   the terms of this agreement, and I voluntarily agree to those terms.

22   I have discussed the evidence with my attorney, and my attorney has

23   advised me of my rights, of possible pretrial motions that might be

24   filed, of possible defenses that might be asserted either prior to or

25   at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a),

26   of relevant Sentencing Guidelines provisions, and of the consequences

27   of entering into this agreement.  No promises, inducements, or

28   representations of any kind have been made to me other than those

                                    14

1  contained in this agreement.  No one has threatened or forced me in

2  any way to enter into this agreement.  I am satisfied with the

3  representation of my attorney in this matter, and I am pleading

4  guilty because I am guilty of the charge and wish to take advantage

5  of the promises set forth in this agreement, and not for any other

6  reason.

7

8  _____          11/29/2021
   DAVID F. ALEXANDER                       Date

9  Defendant

10              CERTIFICATION OF DEFENDANT'S ATTORNEY

11     I am DAVID F. ALEXANDER's attorney.  I have carefully and

12  thoroughly discussed every part of this agreement with my client.

13  Further, I have fully advised my client of his rights, of possible

14  pretrial motions that might be filed, of possible defenses that might

15  be asserted either prior to or at trial, of the sentencing factors

16  set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines

17  provisions, and of the consequences of entering into this agreement.

18  To my knowledge: no promises, inducements, or representations of any

19  kind have been made to my client other than those contained in this

20  agreement; no one has threatened or forced my client in any way to

21  enter into this agreement; my client's decision to enter into this

22  agreement is an informed and voluntary one; and the factual basis set

23  forth in this agreement is sufficient to support my client's entry of

24  a guilty plea pursuant to this agreement.

25

26  _____          11/29/21
   NINA MARINO                              Date

27  Attorney for Defendant DAVID F.
   ALEXANDER

28

                           15

1 **ATTACHMENT A**

2 FACTUAL BASIS

3 **I.   BACKGROUND**

4     1.   The Los Angeles Department of Water and Power ("LADWP") is

5 the largest municipal utility in the United States.  At all relevant

6 times, LADWP received federal funds and benefits in excess of $10,000

7 annually.

8     2.   From May 29, 2017, until February 25, 2019, defendant DAVID

9 F. ALEXANDER was the Chief Information Security Officer of LADWP.

10 From February 25, 2019, until on or about August 12, 2019, defendant

11 ALEXANDER was the Chief Cyber Risk Officer of LADWP.  In both

12 capacities, defendant ALEXANDER reported directly to the Chief

13 Administrative Officer of LADWP, who reported directly to the LADWP

14 General Manager.  At all relevant times, defendant ALEXANDER was an

15 agent of LADWP and a public official.

16     3.   Starting around 2017, defendant ALEXANDER developed a

17 professional relationship with Paul O. Paradis, a New York lawyer

18 who, among other things, represented LADWP as counsel in a lawsuit

19 against PricewaterhouseCoopers over a dispute regarding LADWP's

20 faulty billing system.  Paradis also had a company known as Aventador

21 Utility Solutions, LLC ("Aventador"), which performed remediation

22 work on the faulty billing system, as well as certain cybersecurity-

23 related work for LADWP, pursuant to a $30 million contract with

24 LADWP.

25     4.   In or around March 2019, Paradis purportedly sold Aventador

26 to an employee, and Aventador officially changed its name to Ardent

27 Cyber Solutions, LLC ("Ardent").  Paradis was to have no financial

28 interest in, or control over, Aventador and its successor, Ardent.

5.   At all relevant times, the Southern California Public Power Authority ("SCPPA") was a collective group of eleven municipal utilities that included LADWP.  At the request of a member utility, SCPPA had the ability to facilitate joint service contracts.

II.   **THE AVENTADOR/ARDENT BRIBERY SCHEME**

  A.   **Defendant ALEXANDER Manipulates Two Bidding Processes to Help Secure LADWP Contracts for Paradis's Aventador/Ardent**

    1.   The SCPPA Request for Proposal Process

6.   On February 8, 2019, SCPPA issued a Request for Proposal ("RFP") for a cybersecurity services contract (the "SCPPA RFP") at the request of LADWP's then-General Manager, David Wright.  Defendant ALEXANDER, who was the Vice-Chair of the SCPPA Cyber Security Working Group, was the primary drafter of the SCPPA RFP.  The SCPPA RFP solicited proposals from vendors to provide cybersecurity services in eleven defined areas.  The SCPPA RFP contemplated that multiple vendors would be awarded a cybersecurity services contract with SCPPA under a master agreement, under which individual member utilities, like LADWP, could independently engage a vendor's services.

7.   Defendant ALEXANDER was one of four members of the scoring committee for the SCPPA RFP, which was responsible for conducting a preliminary review and assessment of the proposals submitted in response to the SCPPA RFP and then presenting its scores and recommendations to the SCPPA Cybersecurity Working Group.

8.   Defendant ALEXANDER knew and understood that the SCPPA RFP process was intended to be a competitive, neutral, and transparent process in order to ensure the integrity of the cybersecurity bench. Defendant ALEXANDER, however, manipulated the SCPPA RFP process with the goal of securing future cybersecurity work for Aventador.  After

Defendant's initials: ___ __    2

1  Aventador became Ardent, defendant ALEXANDER sought to secure future
2  work for Ardent.  Defendant ALEXANDER should have known, and knew no
3  later than July 16, 2019, that Paradis was supposed to have no role
4  in or involvement with Aventador or Ardent.  Nonetheless, defendant
5  ALEXANDER knew and understood that Paradis was actually serving as
6  the principal of Ardent, including by pursuing the cybersecurity
7  services contract for Ardent through the SCPPA RFP.

8      9.   Between late February 2019 and April 2019, defendant
9  ALEXANDER used his position and influence as the LADWP Chief Cyber
10 Risk Officer and the Vice-Chair of the SCPPA Cyber Security Working
11 Group to manipulate the SCPPA RFP process, including by influencing
12 the composition of the scoring committee to include individuals whom
13 he could persuade to rank Ardent favorably and by sharing his scores
14 for the SCPPA proposals with other members of the committee in an
15 effort to persuade them to score Ardent favorably.

16     10.  On April 5, 2019, the SCPPA Cybersecurity Working Group
17 informed Ardent that it would recommend Ardent for the SCPPA
18 contract.

19     11.  On April 5, 2019, defendant ALEXANDER met with Paradis at a
20 restaurant in Los Angeles.  During this meeting, defendant ALEXANDER
21 told Paradis that he had used the SCPPA bidding process to get
22 LADWP's "desired outcome," that is, a contract with Ardent, but in a
23 manner that falsely appeared "completely transparent."  Defendant
24 ALEXANDER boasted that he was the one who had secured the contract
25 for Ardent, informing Paradis, "that was me driving it."

26     12.  On April 18, 2019, the SCPPA Board approved a multi-award
27 contract for Ardent and two other vendors valued at a total of
28

Defendant's initials: _____   3

1  approximately $17,000,000.

2      13.  Shortly after SCPPA awarded the contracts, the City

3  instructed LADWP to re-bid the contracts through the standard LADWP

4  procurement process (the "LADWP RFP"), instead of through SCPPA.   In

5  the interim, the LADWP Board of Commissioners approved short-term

6  "bridge" contracts for Ardent and the other two vendors.

7                  2.   The LADWP RFP Process

8      14.  On June 17, 2019, LADWP issued the LADWP RFP for the award

9  of a three-year, $82.5 million Cybersecurity Consulting Services

10  contract, with a submission deadline of July 10, 2019.  Defendant

11  ALEXANDER knew and understood that state and local laws and

12  regulations required the LADWP RFP process to be a fully competitive,

13  neutral, and transparent process in order to ensure fair competition

14  amongst the vendors and to ensure that LADWP acquired the services of

15  a qualified vendor that satisfied its requisite criteria.

16      15.  Defendant ALEXANDER was one of seven members of the

17  evaluation committee that was responsible for reviewing the proposals

18  submitted in response to the LADWP RFP.  All evaluators, including

19  defendant ALEXANDER, signed a sworn nondisclosure agreement that they

20  would not discuss their scoring on the proposals with anyone.

21      16.  In late May 2019, before the LADWP RFP was issued,

22  defendant ALEXANDER began his efforts to also manipulate the LADWP

23  RFP process to favor Ardent.  Defendant ALEXANDER was one of the

24  drafters of the anticipated LADWP RFP, and he shared drafts of the

25  LADWP RFP with Paradis and solicited Paradis's edits.  By these

26  actions, defendant ALEXANDER intended to craft and crafted the LADWP

27  RFP to correspond with Ardent's specific strengths and to improve

28

Defendant's initials: ___   4

1   Ardent's odds of being awarded the contract.

2       17.   After the LADWP RFP was issued, between in or around June

3   and July 2019, defendant ALEXANDER worked closely with Paradis to

4   help him improve Ardent's proposal for submission, including by

5   reviewing and editing drafts of Ardent's proposal.

6       18.   On July 10, 2019, Paradis caused Ardent to submit its

7   proposal to the LADWP RFP.   In total, over a dozen vendors submitted

8   proposals for the LADWP RFP.

9       19.   Defendant ALEXANDER also undertook efforts to influence the

10  other members of the evaluation committee to rate Ardent favorably,

11  notwithstanding the sworn nondisclosure agreement.   For example, on

12  July 9, 2019, the day before the submission deadline for proposals

13  for the LADWP RFP, defendant ALEXANDER told Paradis, via text

14  message, that he would "handle" another individual on the evaluation

15  committee because he believed that he and the other individual could

16  work well together "toward our desired goals."   In response, Paradis

17  asked if defendant ALEXANDER was confident that the individual would

18  "cooperate with you and rank Ardent with a very high overall score."

19  Defendant ALEXANDER responded, "Very...."

20      20.   On July 9, 2019, Paradis told defendant ALEXANDER, via text

21  message, that after he submitted the Ardent proposal, "it will be up

22  to you to 'manage' the evaluators the same way you did for the SCPAA

23  [sic] process so that we get the correct result... 😉 [winking face

24  emoji]."   Defendant ALEXANDER responded via text message, "I know my

25  job 😂 [crying-laughing emoji]."

26      21.   On July 12, 2019, defendant ALEXANDER told Paradis, via

27  text message, about the required sworn nondisclosure agreement.

28

Defendant's initials: _____    5

1 | Defendant ALEXANDER remarked that this requirement "seriously limits
2 | me," which was a reference to his planned efforts to influence the
3 | other evaluators to rate Ardent favorably.  Paradis responded that he
4 | was not concerned about defendant ALEXANDER being "limited" because,
5 | as defendant ALEXANDER had told Paradis earlier, defendant ALEXANDER
6 | "know[s] his job."

7 |         22.  On July 15, 2019, defendant ALEXANDER, via text message,
8 | advised Paradis that he had provided two of the evaluators with
9 | "'cliff notes' on my proposal thoughts."

10 |        **B.    Defendant ALEXANDER Seeks Employment at Ardent from
11 |                Paradis, and Paradis Agrees to Hire Him**

12 |        23.  On July 16, 2019, defendant ALEXANDER met with Paradis for
13 | lunch at a restaurant in Los Angeles.  During this meeting, defendant
14 | ALEXANDER again told Paradis that he and the other evaluators for the
15 | LADWP RFP had been required to sign an agreement attesting that they
16 | would not speak to each another about their scores for the LADWP RFP
17 | responses.  Defendant ALEXANDER explained that, notwithstanding this
18 | signed agreement, he had provided his score sheet to two other
19 | evaluators in order to influence them to give Ardent a high score.
20 | Defendant ALEXANDER stated that he was working to speak with other
21 | evaluators for the same purpose.  Paradis thanked defendant ALEXANDER
22 | for his help securing the LADWP RFP for Ardent.

23 |        24.  During this same lunch meeting, Paradis asked defendant
24 | ALEXANDER what his future employment plans were.  Defendant ALEXANDER
25 | responded that he was considering multiple options outside of LADWP
26 | and informed Paradis that he was interested in working at Ardent as
27 | its business manager.  Defendant ALEXANDER and Paradis discussed this

28 |

Defendant's initials: _____    6

proposed job, including the general scope of job responsibilities for defendant ALEXANDER, the future location and growth of Ardent, and Ardent's "platinum-level" health insurance benefits.  Defendant ALEXANDER and Paradis also discussed a prospective start date of September 1, 2019.  At Paradis's suggestion, defendant ALEXANDER agreed to create a written job description of defendant ALEXANDER's intended role at Ardent, along with his terms and conditions for the job.  Defendant ALEXANDER told Paradis that he needed to confirm the terms of his retirement package from LADWP, since the contemplated Ardent start date would require him to leave LADWP two years before reaching the retirement age.

25.   Near the end of the lunch meeting, defendant ALEXANDER told Paradis that he would make sure that the LADWP RFP evaluation for Ardent "stays in order," meaning that he would continue his efforts to improperly influence the LADWP RFP process in Ardent's favor. Defendant ALEXANDER told Paradis that he would need to remain at LADWP at least until he had secured the LADWP contract for Ardent. Accordingly, defendant ALEXANDER told Paradis that he could not start on September 1, 2019, and that he would need to stay at LADWP until at least October 2019.  Paradis agreed.

26.   After the lunch meeting, defendant ALEXANDER, via text message, asked Paradis who Ardent employed as its Chief Financial Officer.  Paradis responded that it was someone he had known for over 12 years and inquired why defendant ALEXANDER was asking.  Defendant ALEXANDER replied that he was "scoping" his role and responsibilities "for my new job."  Paradis responded via text message that defendant ALEXANDER's job duties "will be what we discussed, namely operations

Defendant's initials: _____ __   7

1  and business management."   Defendant ALEXANDER stated, "So I am
2  thinking essentially a Chief Administrative Officer," to which
3  Paradis replied, "I agree completely."

   C.  **Defendant ALEXANDER Guarantees Future Task Orders for**
       **Ardent in Return for Additional Compensation from Paradis**

6  27.  On July 17, 2019, defendant ALEXANDER, via text message,
7  told Paradis that he had "[j]ust finished my conversation with the
8  retirement group.  Not good at all.  We need to talk to discuss
9  options, when you have a chance."

10 28.  Later that same day, defendant ALEXANDER and Paradis met at
11 a coffee shop in Los Angeles.  During the meeting, defendant
12 ALEXANDER and Paradis discussed the following:

13    a.   Defendant ALEXANDER relayed to Paradis that he had
14 learned from an LADWP retirement analyst that if he retired before
15 the age of 55, he would lose what amounted to $60,000 a year "for 30
16 years" or "for the rest of [his] life."  During his conversation with
17 Paradis, defendant ALEXANDER repeatedly referred to the retirement
18 penalty as a loss of $60,000 a year over 30 years, or "for the rest
19 of [his] life."

20    b.   Paradis responded that the retirement penalty was
21 "easily handled," but that if Paradis was going to "guarantee"
22 additional compensation to make up for defendant ALEXANDER's loss in
23 LADWP retirement income, defendant ALEXANDER would also need to
24 "guarantee certain things."  In exchange for the additional
25 compensation, defendant ALEXANDER told Paradis that he while he
26 remained at LADWP, he could provide certain guarantees to Paradis and
27 Ardent in the form of future task orders from LADWP that assigned

28

Defendant's initials:  __ __    8

1   specific work for which Ardent could be compensated.

2         c.   Specifically, as the Chief Cyber Risk Officer at
3   LADWP, defendant ALEXANDER communicated to Paradis that he could
4   procure task orders for Ardent's cybersecurity work under the
5   anticipated LADWP contract.   Defendant ALEXANDER calculated for
6   Paradis the amount of money defendant ALEXANDER could allocate in a
7   task order to Ardent.   Defendant ALEXANDER stated that he could also
8   guarantee Ardent task orders for cybersecurity training.

9         d.   Defendant ALEXANDER told Paradis that he could
10  "guarantee" Ardent a total of $10,500,000 to $11,500,000 in task
11  orders in two specified sectors.   Additionally, defendant ALEXANDER
12  stated that he could help to push work towards Ardent in a third
13  sector, namely remediation.

14        e.   Defendant ALEXANDER and Paradis discussed the need for
15  defendant ALEXANDER to stay on longer at LADWP to deliver on these
16  guarantees.   In exchange for defendant ALEXANDER's agreement to stay
17  at LADWP to secure the promised task orders to Ardent, Paradis
18  offered to pay a bonus for the period of time defendant ALEXANDER
19  stayed on at LADWP "from our deal on."   Defendant ALEXANDER agreed
20  and commented that the payment amounted to a "signing bonus."

21        f.   Near the end of their meeting, defendant ALEXANDER
22  confided that he would tell no one about his corrupt arrangement with
23  Paradis, stating that "[a]s far as what I do and when I can execute
24  against that contract is between you, me, and the wall."   Defendant
25  ALEXANDER added that "[his] wife is not even going to know.   She has
26  to be able to attest."

27     29.  By his actions, defendant ALEXANDER solicited and agreed to
28

Defendant's initials: _____   9

1  accept from Paradis a future job as the Chief Administrative Officer

2  of Ardent, a to-be-determined executive-level annual salary, a sign-

3  on bonus, and recompense for his early retirement penalty from LADWP.

4  Defendant ALEXANDER did so intending to be influenced and rewarded in

5  connection with his ongoing assistance in securing the award of a

6  multi-million dollar LADWP contract to Ardent and use of his position

7  to guarantee over $10,000,000 in future task orders for Ardent under

8  the anticipated LADWP contract.

9       D.   Defendant ALEXANDER Asks for a Secret Ardent E-Mail Address
            and Laptop to Communicate with Paradis and to Secretly
10           Perform Work for Ardent

11      30.  Following his meeting with Paradis on July 17, 2019, and

12  consistent with their illegal arrangement, defendant ALEXANDER

13  continued his efforts to manipulate the LADWP RFP process in Ardent's

14  favor.

15      31.  Defendant ALEXANDER also began advising Paradis more

16  broadly about business plans for Ardent, consistent with their secret

17  agreement for defendant ALEXANDER to be the Chief Administrative

18  Officer for Ardent.  For example, on July 18, 2019, defendant

19  ALEXANDER told Paradis via text message that, "we need to build some

20  artwork and [collateral] for our RFPs, going forward."  On that same

21  day, defendant ALEXANDER provided Paradis with information about

22  another SCPPA RFP in which Paradis had indicated an interest in

23  applying for Ardent and advised Paradis that it was such a small

24  amount that it was not worth it "for us to even fucking bother."

25      32.  During a phone call on July 18, 2019, defendant ALEXANDER

26  asked Paradis for a secret e-mail account with Ardent that did not

27  have his name on it.  Paradis responded that he could provide the

28

Defendant's initials: ___DA___   10

1  requested e-mail address, as well as a laptop, for defendant
2  ALEXANDER's use.  Defendant ALEXANDER agreed that an Ardent-issued
3  laptop would be helpful so that he could "do all that work with no
4  evidence anywhere else" and because "if anything happens, I just give
5  you the laptop back and it's lock, stock, and barrel, and I don't
6  have anything anywhere else."  Paradis agreed to drop off the laptop
7  for defendant ALEXANDER the following day.

8      33.  On July 19, 2019, defendant ALEXANDER, via text message,
9  asked Paradis if he was still planning to deliver the Ardent-issued
10 laptop that day.  On a phone call that same day, defendant ALEXANDER
11 and Paradis agreed on a secret e-email address of
12 "FrancesW@ardent.com."

13 **III. Defendant ALEXANDER's Lies to the FBI**

14     34.  On July 22, 2019, the Federal Bureau of Investigation
15 ("FBI") executed search warrants at LADWP as part of its ongoing
16 investigation into LADWP and the Los Angeles City Attorney's Office.

17     35.  On July 24, 2019, defendant ALEXANDER participated in a
18 voluntary interview with the FBI.  During that interview, defendant
19 ALEXANDER falsely stated that he had declined any employment
20 opportunity with Ardent and that he had not expected any compensation
21 from Paradis.

22     36.  Defendant ALEXANDER knowingly, willfully, and deliberately
23 made these materially false statements and representations to the FBI
24 during the July 24, 2019 interview knowing that these statements and
25 representations were untrue and that his conduct was unlawful.
26 Defendant ALEXANDER's false statements were made in a matter within
27 the jurisdiction of the FBI and were material to the activities and
28

Defendant's initials:  ___   11

1    decisions of the FBI.

2        37.   On July 26, 2019, defendant ALEXANDER participated in

3    another voluntary interview with the FBI.   During that interview,

4    defendant ALEXANDER falsely stated that he had declined any

5    employment opportunity with Ardent and that he had never provided any

6    guarantees to Ardent or to Paradis.

7        38.   Defendant ALEXANDER knowingly, willfully, and deliberately

8    made these materially false statements and representations to the FBI

9    during the July 26, 2019 interview knowing that these statements and

10   representations were untrue and that his conduct was unlawful.

11   Defendant ALEXANDER's false statements were made in a matter within

12   the jurisdiction of the FBI and were material to the activities and

13   decisions of the FBI.

Defendant's initials: _____  12